UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROSIE ABERCROMBIE,                    :    Case No. 1:09-cv-198
                                      :
        Plaintiff,                    :    Judge Michael R. Barrett
                                      :    Magistrate Judge Timothy S. Black
vs.                                   :
                                      :
COMMISSIONER OF                       :
SOCIAL SECURITY,                      :
                                      :
        Defendant.                    :

**REPORT AND RECOMMENDATION[1] THAT: (1) THE ALJ'S NON-
DISABILITY FINDING BE FOUND SUPPORTED BY SUBSTANTIAL
EVIDENCE, AND AFFIRMED; AND (2) THIS CASE BE CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the

administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore

unentitled to a disability insurance benefits ("DIB") and supplemental security income

benefits ("SSI"). (*See* Administrative Transcript ("Tr.") (Tr. 16-25) (ALJ's decision)).

**I.**

On June 18, 2002, Plaintiff filed an application for DIB and SSI, alleging that she

became disabled on April 6, 2001, due to back problems. (Tr. 61-63).

Upon denial of her claims on the state agency levels, she requested a hearing *de

novo* before an ALJ. A hearing was held on June 10, 2004, at which Plaintiff appeared

with counsel and testified. (Tr. 643-70).

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and
Recommendation.

Following the hearing, the ALJ issued a final administration decision on December 7, 2004, denying benefits. (Tr. 353). On review, the Appeals Council upheld the denial of the DIB application but remanded the SSI application for consideration of additional medical evidence. (Tr. 373-74).

On remand, the ALJ conducted a second administrative hearing on October 9, 2007. Plaintiff was represented by an attorney and testified at the hearing. (Tr. 681-93). The ALJ also heard testimony from Dr. George Parsons, a vocational expert. She then issued a decision dated October 24, 2007, denying Plaintiff's SSI application for a second time. (Tr. 16-25) After the Appeals Council rejected Plaintiff's further request for review, Plaintiff filed the action that is presently before this Court.

At the time of the hearing, Plaintiff was 49 years old. (Tr. 23). She has a tenth grade education and some vocational training as a certified nurse's aide. (Tr. 683). Her past relevant work experience was as a cashier. (Tr. 23).

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1.  The claimant has not engaged in substantial gainful activity since June 27, 2002, the application date (20 CFR 416.920(b) and 416.971 *et seq*.).

2.  The claimant has the following severe impairments: degenerative disease of the lumbar spine, degenerative disease in the left shoulder, and degenerative disease in the cervical spine (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part

404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work except the following restrictions. She is able to lift, push, and pull 30-35 pounds occasionally and 20-30 pounds frequently. She cannot perform prolonged standing or sitting. She can perform only occasional, not repetitive overhead reaching. Otherwise, the ability to handle objects, hear, speak, and travel short distances are unaffected.

5.      The claimant is able to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on November 10, 1957 and is 49 years old, which is defined as an individual closely approaching advanced age (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue in this case (20 CFR 416.968).

9.      In the alternative, even if the claimant cannot do any past work, considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since June 27, 2002, the date the application was filed and continuing through the date of this decision (20 CFR 416.920(g)).

(Tr. 18-24).

In summary, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB or SSI. (Tr. 25).

On appeal, Plaintiff argues that: (1) the ALJ erred when she failed to give proper deference or weight to the opinions expressed by Plaintiff's attending physicians; (2) the

ALJ erred when she selectively choose evidence from the record to support her ultimate

conclusion of work capability; and (3) the ALJ erred when she improperly discounted

Dr. Herr's opinion based on innuendo regarding medication compliance issues. Each

argument will be addressed in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability

finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this

review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359,

362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that

finding must be affirmed, even if substantial evidence also exists in the record upon

which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal
> merely because substantial evidence exists in the record to
> support a different conclusion. The substantial evidence
> standard presupposes that there is a "zone of choice" within
> which the Commissioner may proceed without interference
> from the courts. If the Commissioner's decision is supported
> by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is

entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present

sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

## A.

For her first assignment of error, Plaintiff maintains that the ALJ erred when she failed to give proper deference or weight to the opinions expressed by Plaintiff's attending physicians.

The record evidence shows that:

The earliest medical records in the file reflect sporadic treatment by Dr. LeRoy Shouse, M.D., an orthopedic surgeon, in 1984 and 1985 (Tr. 125-33) and again from 1993 to 1994 (Tr. 134).  The record reflects no further medical treatment until November 2001.  Plaintiff alleges that she became disabled on April 6, 2001.  (Tr. 61).

On November 15, 2001, Plaintiff presented at the Adams County Hospital for lower back pain.  Plaintiff's x-ray showed "mild degenerative changes" but was "otherwise normal."  (Tr. 216-17).  The physician administered pain medication, and Plaintiff reported her "symptoms were completely relieved."  (Tr. 216).

In March and May 2002, Plaintiff received treatment three times at Adams County Hospital's emergency room for lowback pain.  (Tr. 209-210, 227, 230, 232-33).  Plaintiff's x-ray showed "mild degenerative changes" but was "otherwise normal."  (Tr. 227, 210, 230).  After receiving pain medication at her first visit, Plaintiff reported her

"symptoms were completely relieved." (Tr. 227). Plaintiff returned to Dr. Shouse on May 23, 2002, and he opined that her neurological examination was normal. (Tr. 152).

On August 18, 2002, Plaintiff presented at the Meadowview Regional Medical Center complaining of lower back, neck, and bilateral shoulder pain. (Tr. 236-37). She again reported relief upon treatment. (Tr. 238). On September 16, 2002, Dr. Olayinka Aina, M.D., M.P.H., conducted a consultative examination. (Tr. 242-44). Plaintiff reported she was "filing for disability . . . because of low back pain, and left shoulder pain." (Tr. 242). Although she claimed "she ha[d] been unable to do her daily activities," Dr. Aina noted she reported being able to "dress, undress, [and] bathe herself as well as tie her shoes." (*Id.*) Dr. Aina's physical examination revealed that Plaintiff exhibited normal balance, could "walk on her heels and toes" and squat, and had "no tenderness on palpation of any of the joints." (Tr. 243). Dr. Aina found no abnormalities in her neurological examination, or in x-rays of Plaintiff's left shoulder. (Tr. 243, 245). Plaintiff had full strength in all extremities, normal grasp, manipulation, pinch, and fine coordination in both hands. (Tr. 247). Dr. Aina found no muscle spasms or atrophy. (*Id.*) He noted a reduced range of motion in her left shoulder and lumbar spine. (Tr. 248-49). Dr. Aina opined that Plaintiff could "lift, pull and push 30-35 pounds occasionally and 25-30 pounds occasionally" and noted that "[p]rolonged standing and sitting may be affected." (Tr. 244). He found no limitations in handling objects, hearing, speaking, or short traveling. (*Id.*)

Plaintiff first received orthopedic treatment on January 30, 2003, nearly two years after her alleged onset date. (Tr. 330). She presented to Dr. Herr with complaints of pain and "numbness in the lower extremities particularly the left side" and other aches and pains in her "arms, back, feet, hands, hip, legs, neck and shoulders." (*Id.*) Dr. Herr recommended "conservative treatments" and noted that Plaintiff would "likely improve particularly from the shoulder procedures." (*Id.*)

At a follow-up appointment on February 20, 2003, Dr. Herr noted that nerve studies were "normal with no EMG evidence of nerve entrapment, neuropathy or lumbosacral radiculopathy." (Tr. 329). He recommended further study of her subjective complaints (*Id.*) and a cortisone injection. He believed that she would have no work restrictions after the procedure. (*Id.*)

On March 3, 2002, Dr. Herr noted that Plaintiff had "normal ranges of motion" in her spine, including her lumbar spine. (Tr. 328). Her straight leg raise tests were negative. (*Id.*) She had good muscle strength and deep tendon reflexes in all extremities. (*Id.*) MRI studies "showe[ed] some modest recess stenosis" in her lower back at the L5-S1 vertebrae and a disc rupture in her neck, which was "consistent with her neck pain, headaches, and left shoulder and arm pain." (*Id.*) On March 12 and again on April 9, 2003, he recommended fusion surgery to correct the herniated disc in her neck. (Tr. 323-25, 327). The record reflects no further treatments for the next four months.

Dr. Herr successfully performed the fusion on August 8, 2003. (Tr. 321-22).

Plaintiff reported "essentially complete relief" of her shoulder pain upon discharge the next day. (Tr. 320). Plaintiff had "no pain in the left shoulder [and was] able to move the shoulder through full active ranges of motion without pain" on August 11, 2003. (Tr. 319). On August 14, 2003, Dr. Herr recorded that Plaintiff "ha[d] responded dramatically to her surgery" and "no longer ha[d] problems with [range of motion or] pain of the left shoulder or arm." (Tr. 318-17).

Four months later, having not seen her since the shoulder procedure, Dr. Herr's office called Plaintiff to check on her progress. (Tr. 316). Although she "stated she [was] still in a lot of pain," she cancelled her appointment for treatment and did not reschedule. (*Id*.) Dr. Herr reviewed Plaintiff's MRI study on January 22, 2004. (Tr. 315). The imaging technician noted a "[m]ild . . . bulging disc" in her upper lumbar spine "without focal herniation . . . [or] significant spinal stenosis." (Tr. 292). He found only "mild spinal stenosis" in her lower lumbar spine. (*Id*.) Dr. Herr's analysis also found "spinal stenosis associated with" a bulging disc and "congenital spinal stenosis." (Tr. 315). He recommended epidural injections. (*Id*.)

From January through March 2004, Plaintiff received several chiropractic treatments (Tr. 256-77, 279-83) providing some relief (*E.g*., Tr. 256-73). She canceled or failed to show at four appointments. (Tr. 256, 259, 271, 272).

Dr. Herr next treated Plaintiff on April 8, 2004, noting that she felt results from epidural injections were "favorable." (Tr. 314). On May 19, 2004, Dr. Herr summarized

his diagnosis in a letter to Plaintiff's attorney. (Tr. 289-90). He noted Plaintiff had "dramatic relief of headaches, neck and shoulder pain" following neck surgery, and noted his findings and opinions were consistent with other medical evidence showing a bulging disc and "[b]orderline" or "[r]elative mild spinal stenosis" in her lumbar spine. (Tr. 289). Nonetheless, Dr. Herr then stated in the letter to the attorney that Plaintiff was "unemployable in any capacity" and that she was "permanently totally disabled by virtue of her spine condition." (Tr. 290).

The record reflects no further treatments for nearly twelve months. Dr. Joel Sorger, M.S., F.A.C.S., an orthopedic surgeon, treated Plaintiff for shoulder pain on March 10, 2005. (Tr. 406). While she had pain with motion and palpation in her shoulder, she was "neurovascularly intact" and had no complaints concerning her back or legs. (*Id.*) He recommended physical therapy. (*Id.*) Two months later, on May 12, 2005, Dr. Sorger noted Plaintiff still had complaints of pain and recorded some impingement and reduced range of motion in her left shoulder. (Tr. 405). The treatment notes reflect no complaints about her back. (*Id.*) Dr. Sorger completed successful decompression surgery on Plaintiff's left shoulder on June 17, 2005. (Tr. 403-04). Plaintiff was "doing well" at her June 30, 2005, follow-up. Dr. Sorger prescribed a physical therapy plan for Plaintiff at Adams County Hospital. (Tr. 399). She cancelled two of her first five appointments (Tr. 400), and then failed to show up for three straight appointments (Tr. 394, 400). Plaintiff was "discharged due to non-complian[ce]" on August 3, 2005. (Tr. 394).

During the same period, Dr. A. Lee Greiner, M.D., treated Plaintiff for complaints of low back pain. (Tr. 471). On June 12, 2005, Dr. Greiner found "no structural evidence that correlate[d] with [Plaintiff's] stated symptoms" in her lower back. (*Id*.) Although Dr. Greiner continued to attempt to treat Plaintiff sporadically until September 2006, the treatment notes indicate Plaintiff failed to "deliver[] her cervical films for review" by Dr. Greiner and was "self-discharged" from his care on September 7, 2006. (Tr. 465).[2]

In July 2006, Plaintiff saw Dr. Phillip Swedberg, for an initial consultation. (Tr. 414, 416). She reported being seen by another doctor but had recently been "dismissed from his office secondary to [her] pill count being off . . . by 5" pills. (Tr. 416). She reported back and shoulder pain. (*Id*.) Dr. Swedburg prescribed morphine and recommended further consultations, but also scheduled a toxicology screening and "told [Plaintiff] that [he would] also do pill counts and [would] check her urine periodically." (*Id*.)

On August 5, 2006, Dr. Aina, who had previously conducted Plaintiff's 2002 consultative examination, treated Plaintiff at the Adams County Hospital emergency room for reports of neck and back pain. (Tr. 425-27). Dr. Aina's physical examination and review of Plaintiff's x-rays found her cervical spine had a full range of motion, with no tenderness, muscle spasms, or other abnormalities. (Tr. 428).

On August 17, 2006, Dr. Swedberg noted Plaintiff's toxicology results were

---

[2]    Staff notes entered in October 2006 indicate Plaintiff "chose to follow-up with her primary care physician for cervical recommendations." (Tr. 464).

"positive for opiods" but negative for some of the medications he had prescribed. (Tr. 411). Dr. Swedberg was "very suspicious that [Plaintiff was] not taking her medications as directed" and disconcerted at Plaintiff's "insisten[ce] that she has been taking her" medications. (*Id.*) Plaintiff reported neck pain, but "denie[d] any radiation of pain down her arms." (*Id.*) Dr. Swedberg discontinued one of her medications due to "two negative urine tox[icology] screens" for the drug. (*Id.*)

On August 29, 2006, Plaintiff returned to Dr. Herr "after an extended interval," her last visit having been on February 10, 2005. (Tr. 417). Plaintiff complained of increasing neck pain and back pain. (*Id.*) Dr. Herr ordered further imaging tests (Tr. 419) and reviewed these results with Plaintiff, but did not recommend any treatments (Tr. 481). Dr. Herr saw her again on October 23 and November 20, 2006, but other than reviewing her symptoms, he made no treatment recommendations and only scheduled follow-up appointments. (Tr. 476-78).

On September 26, 2006, Dr. Swedberg's treatment notes indicate that an anonymous caller contacted his office stating that Plaintiff was "getting . . . oxycontin and methadone" from Dr. Gloria Walker, M.D., a pain management specialist (Tr. 454), and had not told Dr. Swedberg (Tr. 409).[3] Dr. Swedberg ordered Plaintiff be given "[n]o further controlled substances." (Tr. 409). Treatment notes from Dr. Walker dated November 15, 2006, directed that Plaintiff's prescriptions not be refilled and indicated

_____

[3]     The first time Dr. Swedberg listed methadone or oxycontin among Plaintiff's medications was in treatment notes dated October 3, 2006. (Tr. 408).

that Dr. Walker would order additional drug screening.  (Tr. 460).

On November 16, 2006, Dr. Swedberg refused to fill Plaintiff's prescription for oxycontin due to the anonymous call and negative drug screens, and directed her to contact Dr. Walker for any further prescriptions.  (Tr. 496).  In early December, Dr. Walker also found Plaintiff's drug screens were negative for prescribed medications and refused to fill her prescriptions.  (Tr. 528).  When Plaintiff informed Dr. Swedberg of her discharge from Dr. Walker's office, and asked him to fill her prescriptions instead, including one telephone request that he give her prescriptions "so that they would show up in her [urine drug screen]" the following day at his office (Tr. 498), Dr. Swedberg declined (Tr. 493-94).

Dr. Swedberg continued to treat Plaintiff from February 2007 through November 2007.  His treatment notes reflect Plaintiff had reported her back pain was stable in February (Tr. 491), and otherwise do not note any back or neck complaints (Tr. 485-92).  He ordered an MRI of her lumbar spine in November 2007 that revealed a "small . . . disc protrusion," but "no other significant disc abnormality."  (Tr. 545).  The doctor reviewing the MRI found "[n]o spinal stenosis or nerve root compromise."  (*Id.*)  Dr. Herr opined that this MRI did show spinal stenosis and recommended a surgical consultation.  (Tr. 554).  Dr. Gregory Mavian, D.O., F.A.C.O.S., examined Plaintiff based on Dr. Herr's referral, but opined that he "[did] not believe that there is any surgical intervention that will help" because he "[did] not feel that the disc protrusion ha[d] anything to do with" her back pain symptoms.  (Tr. 558).

The record reflects that Dr. Herr did not treat Plaintiff again for nearly five months. On March 27, 2007, she presented with complaints of neck, upper extremity, lower back, lower extremity, and knee pain. Dr. Herr noted sciatic irritability, normal reflexes, and 80% range of motion in her cervical spine. (Tr. 474). Plaintiff complained of "pain with flexion" during the knee exam, but Dr. Herr noted normal ligaments and no effusions upon examination. (*Id.*) He recommended lumbar epidural injections and prescribed pain medication. (Tr. 475).

Dr. Herr did not treat Plaintiff for the next seven months. In October 2007, he sent a letter to Plaintiff's attorney, at the attorney's request, that listed diagnoses of Plaintiff's present and past conditions, and stated that "[h]er current treatment include[d] analgestic medication, anti inflammatory medication, and restricted activities." (Tr. 530). He opined that Plaintiff was, and had been since the first treatment in January 2003, "permanently totally disabled from gainful employment and requir[ed] assistance with several [activities of daily living]." (*Id.*) While not listing any restrictions on Plaintiff's activities of daily living, he further opined that these undefined restrictions were "due to an inability to stand, walk, bend, lift, and carry on a continuing and repetitive basis" and that "[s]he require[d] frequent periods of rest throughout the day." (*Id.*) He further suggested she was "incapable of sedentary work," and that "palliative [treatment] . . . [was] not expected to improve her functional capacities." (Tr. 531).

Plaintiff testified at the first hearing on June 10, 2004 that she could "hardly sit up" (Tr. 645), turn her neck to the left (Tr. 645-46), or "raise [her] left arm up" (Tr. 650). She

reported that her legs would give out after walking for a block, and that she could not sit or stand for more than 15 minutes. (Tr. 651). She could not hold a gallon of milk, a dish, or a glass or she would drop them. (Tr. 652). She claimed her legs, arms, and fingers regularly went numb, even when she slept. (Tr. 653). Plaintiff testified that she spent most days lying down watching television, and could not perform basic hygiene without assistance. (Tr. 660-61).

At the second hearing in October 2007, Plaintiff testified that she had always taken her medication as prescribed (Tr. 685) and had never been discharged from a doctor's care because of medication irregularities (*Id.*). She reported that in addition to her left shoulder, neck, and back pain, she was having right shoulder pain and numbness, bilateral leg and knee pain, and muscle spasms. (Tr. 686).

Plaintiff argues that the ALJ improperly weighed the medical evidence by according no weight to Dr. Herr's conclusion made in a letter to Plaintiff's attorney. (Tr. 530-31) (Doc. 8 at 6-8, 9-10). She first claims that the "ALJ completely ignored" Dr. Herr's findings concerning her "documented neck and left shoulder problems." (*Id.* at 7). However, the ALJ's opinion demonstrates otherwise. The ALJ found that the record evidence, including Dr. Herr's findings of facet arthropathy, stenosis, and a positive straight leg test cited in Plaintiff's brief, did support the significant limitations the ALJ included in her RFC determination. She specifically cited the "additional treatment to [Plaintiff's] cervical spine and shoulders" by Dr. Herr and others as the basis for adding "an additional restriction" to the RFC. (Tr. 22).

Plaintiff also claims that Dr. Herr's treatment notes are "replete with objective findings" concerning the severity of her limitations, and, therefore, asserts that the ALJ did not provide a reasonable basis for rejecting Dr. Herr's opinion. (Doc. 8 at 9). (*E.g.*, November 4, 2003 MRI showing stenosis (Tr. 579), January 6, 2004 CT scan showing similar problems (Tr. 578), September 14, 2006 MRI (Tr. 478)). However, as previously noted, there are significant objective findings (including Dr. Herr's findings) that rebut his opinion.

In evaluating the weight to give opinions of treating physicians, the ALJ "[g]enerally . . . give[s] more weight to opinions from . . . treating sources," but only when those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.1527(d)(2). *See also Combs v. Comm'r of Soc. Sec*. 459 F.3d 640, 652 (6th Cir. 2006) (en banc) ("As we held in *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993), a social security ALJ may properly discount a treating physician's opinion of disability: '[t]his court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.'"). The weight the ALJ accords a physician's conclusions depends on the nature of the medical facts upon which that physician relied in reaching his conclusion. Ultimately, it is the ALJ, not the treating physician, who must determine a claimant's RFC and decide when that claimant is disabled for purposes of the Social Security Act. 20 C.F.R. §§

416.927(e)(1).  *See also Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992).  Here, the ALJ properly applied these standards.

**B.**

For her second assignment of error, Plaintiff maintains that the ALJ erred when she selectively choose evidence from the record to support her ultimate conclusion of work capability.

Plaintiff implies that the ALJ improperly relied on Dr. Aina's conflicting opinion because it was conducted in 2002.  (Doc. 8 at 6).  Plaintiff also contends that Dr. Aina's opinion was "[t]he only contrary medical evidence of record."  (*Id.* at 6).  The Sixth Circuit recently rejected this first argument in *McGrew v. Comm'r of Soc. Sec.* 343 Fed. Appx. 26, 28 (6th Cir. 2009), where the ALJ 'clear[ly] . . . considered the medical examinations that occurred after" an earlier state agency assessment, "specifically added a restriction" based on those examinations, and "took into account any relevant changes" in the claimant's condition, including a later surgery.

Identically to *McGrew*, the ALJ specifically noted that Dr. Aina's opinions were consistent with the objective medical evidence available at the time, then discussed the "additional treatment to [Plaintiff's] cervical spine and shoulders" subsequent to Dr. Aina's examination, added "an additional restriction against more than occasional overhead reaching" as a result of those later treatments, and found that "[f]urther restrictions [beyond the RFC as "supported by the assessment of Dr. Aina"] [were] not warranted or supported by the evidence."  (Tr. 22).

Additionally, while Dr. Aina did provide a detailed opinion that conflicted with Dr. Herr's conclusion in his letter to Plaintiff's attorney, this evidence was not the only conflicting evidence that the ALJ relied upon in her decision. As noted above, the ALJ cited evidence that Dr. Herr often observed in his treatment notes that Plaintiff's objective medical tests showed "essentially normal" (Tr. 352) neurological assessments, even as late as March 2007 (Tr. 22), and, at several points, "dramatic" and "essentially complete relief" of Plaintiff's symptoms (Tr. 352). The ALJ found the medical evidence from Dr. Swedberg "showed no mention of the left shoulder on numerous occasions" (Tr. 22), that Plaintiff's "[n]eurological examinations ha[d] generally been normal, and her gait and station [were] not affected" (Tr. 21). Similarly, the ALJ also found that Plaintiff's noncompliance with medication did not support her allegations of disabling levels of pain. (*Id.*) As the ALJ summarized, all of the evidence supported her conclusion not to accord any weight to Dr. Herr's conclusions in his letter to Plaintiff's attorney.

The ALJ also cited Plaintiff's own statements at the hearings as conflicting evidence. (Tr. 21). For example, although Dr. Herr reported in late May 2004 that Plaintiff had "dramatic" relief following shoulder and neck surgeries, she testified less than a month later that she could "hardly sit up" (Tr. 645), turn her neck to the left (Tr. 645-46), or "raise [her] left arm up" (Tr. 650). Similarly, while Dr. Herr's records reflect that Plaintiff told him epidural injections gave her "favorable" results, she testified at the second hearing that the epidural injections gave her no relief. (Tr. 667). Finally, although Plaintiff testified that she always complied with medications, "the evidence

clearly shows otherwise." (Tr. 21).

To the extent Plaintiff characterizes the ALJ's weighing of the evidence discussed above as "selective[] picking," as the Sixth Circuit recently observed, "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). As in *White*, the ALJ has not erred in the instant case, because she has cited substantial evidence supporting her decision. In particular, Plaintiff's characterization overlooks substantial evidence from both decisions relied on by the ALJ that Dr. Herr's "conclusion that [Plaintiff] cannot do even sedentary work" was "not supported by findings upon objective medical testing or findings on physical examination" and that Dr. Herr had "given conflicting and inconsistent statements" regarding Plaintiff's allegedly disabling conditions. (Tr. 23). The ALJ also detailed the differences between the treatment notes and findings of other treating and consulting physicians and Dr. Herr's conclusions in his letter. (Tr. 21-23, 349-52).

In sum, the ALJ reasonably discounted Dr. Herr's conclusion because his opinion was not "well-supported" and was "inconsistent with the other substantial evidence" in the record. *See* 20 C.F.R. § 416.1527(d)(2). The ALJ reasonably and properly based her decision on both the insufficient support for Dr. Herr's conclusions in his clinical findings and the inconsistencies with other record evidence-including Plaintiff's own testimony and noncompliance with pain medication. *See Combs*, 459 F.3d at 652 (finding ALJ did not err in discounting opinion of treating physician "[g]iven the lack of objective evidence" that the ALJ detailed); *Durio v. Comm'r of Soc. Sec.*, 82 F.3d 417 (6th Cir.

1996) (same).

## C.

For her final assignment of error, Plaintiff claims that the ALJ erred when she improperly discounted Dr. Herr's opinion based on innuendo regarding medication compliance issues.

The ALJ reasonably found that Dr. Herr's longitudinal treatment record did not support a conclusion that Plaintiff had an "inability to stand, walk, bend, lift, and carry." (Tr. 530). Apart from the numerous, significant gaps in Dr. Herr's treatment, the ALJ specifically cited Dr. Herr's repeated clinical notations that Plaintiff's objective medical tests showed "essentially normal" (Tr. 352) neurological assessments and, at various times, that Plaintiff had "dramatic" and "essentially complete relief" of her symptoms (*Id.*) The ALJ noted that Dr. Herr's records showed MRIs "of the cervical spine with no spinal cord impingement and . . . of the lumbosacral spine showing only 'mild' stenosis" that did not support his letter to Plaintiff's attorney. The ALJ highlighted that Dr. Herr's letter to Plaintiff's attorney supported his summary conclusion "simply by reporting his diagnosis" and not "by findings upon objective medical testing or findings on physical examination." (Tr. 23).

The ALJ reasonably questioned why Dr. Herr's "report [was] completely silent with respect to the issues of [Plaintiff's] drug usage and credibility" (Tr. 23), a significant concern given that at least *four* other doctors treating Plaintiff during that same period as Dr. Herr had raised repeated concerns about her medication compliance. As the ALJ also

reported, Plaintiff offered contradictory testimony about medication compliance and other issues that further undermined her credibility.

In addition, the ALJ discussed "the objective medical evidence [that] show[ed] only mild degenerative changes of the lumbar spine, essentially normal neurological examinations, and an EMG showing no evidence of nerve entrapment, neuropathy, or radiculopathy." (Tr. 352). The ALJ also cited Plaintiff's lack of orthopedic treatment for two years after the alleged onset date of her disability. (Tr. 349). The record shows that the only time Dr. Herr discussed allegedly serious, "disabling" conditions, such as the "inability to stand, walk, bend, lift, and carry," that were "not expected to improve" (Tr. 531) was when prompted by Plaintiff's attorney (Tr. 530) to submit a letter in support of her DIB application.

Accordingly, the ALJ did not discount Dr. Herr's opinion "based upon innuendo regarding medication compliance issues." Ultimately, the ALJ decided to give no weight to Dr. Herr's opinion because, as discussed above, the medical evidence as a whole did not support his findings, "[h]is assessment [was] not supported by findings upon objective medical testing or findings on physical examination . . . [and] he ha[d] given conflicting and inconsistent statements." (Tr. 23, 19, 21-23, 349-52). The extensive analysis in the ALJ's opinion also distinguishes this case from *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004), where the ALJ failed to consider, among other factors, whether objective medical evidence supported a treating physician's opinions and whether those opinions were consistent with the record as a whole.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and should be affirmed.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner, that Plaintiff was not entitled to disability income benefits and supplemental security income, be found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case be **CLOSED.**

**IT IS SO RECOMMENDED.**

Date: <u>March 1, 2010</u>    <u>s/ Timothy S. Black</u>
            Timothy S. Black
            United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ROSIE ABERCROMBIE, | : | Case No. 1:09-cv-198 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | Magistrate Judge Timothy S. Black |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **14 DAYS** after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to **14 DAYS** (excluding intervening Saturdays, Sundays, and legal holidays) when this Report is being served by mail and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 (1985).